**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| NEEYA A. PATEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 14 C 10002 |
| v. | ) |
| | ) Magistrate Judge Sidney I. Schenkier |
| CAROLYN W. COLVIN, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER[1]

Plaintiff, Neeya Patel, seeks reversal and remand of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits (doc. # 17). The Commissioner responded seeking affirmance of the decision (doc. # 24). For the following reasons, we deny Ms. Patel's motion and affirm the Commissioner's decision.

**I.**

Ms. Patel applied for benefits on September 16, 2011, nearly 10 years after Ms. Patel alleges she became disabled on October 1, 2001 (R. 132). It is undisputed that her date last insured ("DLI") was March 31, 2005 (R. 32, 38). On November 28, 2012, after her application was denied initially and upon reconsideration, Ms. Patel -- who was represented by counsel -- participated in a hearing before an Administrative Law Judge ("ALJ"). After receiving testimony from Ms. Patel and her husband, the ALJ postponed the remainder of the hearing to give Ms. Patel additional time to obtain documents from the period between the alleged onset date and the

---

[1] On February 19, 2015, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. # 7).

DLI (R. 129-30). On May 23, 2013, the ALJ held a supplemental hearing in the case, receiving testimony from a vocational expert ("VE") and a medical expert ("ME"), as well as additional testimony from Ms. Patel. On August 23, 2013, the ALJ issued a written decision denying Ms. Patel benefits. The Appeals Council denied review, making the ALJ's decision as the final word of the Commissioner. *Engstrand v. Colvin*, 788 F.3d 655, 660 (7th Cir. 2015).

## II.

The medical record begins in 1996. In February of that year, Dr. Asok Ray performed surgery on Ms. Patel's right knee to relieve pain, stiffness and weakness (R. 836). Although Ms. Patel's knee was 75 percent better by May 1996, she told Dr. Ray that she had back pain, and despite good range of motion ("ROM") in her lumobsacral (lower) spine, her straight leg raise was limited on the right and left to 80 and 90 degrees, respectively, and an X-ray of her lumbosacral spine revealed a lumbosacral sprain (R. 835). In January 1997, Ms. Patel complained of severe low back pain radiating to her right buttock, hip, thigh and calf, and Dr. Ray gave her a local injection of cortisone over her posterior hip (R. 834). Dr. Ray recommended "conservative treatment," including bed rest, Aleve, and Xanax (*Id.*).

In December 1999 and January 2000, late in her first pregnancy, Ms. Patel again complained of pain in her low back and right knee (R. 833). Dr. Ray noted that her back pain developed from the onset of her pregnancy (*Id.*). He observed that Ms. Patel had severe muscle spasm, mostly on the right paraspinal area, and local tenderness over her entire lumbar musculature (*Id.*). In December 1999, he gave her a small injection of cortisone in three tender areas (*Id.*).[2] Eventually, Ms. Patel went on bed rest from her job in customer service, and she has not worked since (R. 109). Ms. Patel's first child was born in February 2000.

---

[2] The record also contains a handwritten note from a chiropractor stating that she had treated Ms. Patel "around 1999-2000 for lower back pain" (R. 846).

On April 5, 2000, Ms. Patel had an MRI of her lumbar spine (R. 527). That MRI showed degenerative disc disease at L5-S1 level, a bulging disc (about 4 mm protrusion) and foraminal encroachment (also called spinal stenosis, which is a narrowing of the open spaces within the spine, which can put pressure on the spinal cord) (*Id.*).[3] An MRI on May 29, 2001, showed that the disc protrusion had increased slightly to 5 mm, with associated mild to moderate central canal stenosis at the L5-S1 level (R. 528).[4]

Despite Ms. Patel's allegation of a disability onset date of October 1, 2001, the next medical record is a March 12, 2003, report from Dr. Ray. On that date, Ms. Patel complained that lifting her 38 pound child had caused her to have severe low back pain and stiffness, as well as pain in her right buttock, leg and thigh, on and off for the previous six weeks (R. 832).[5] Dr. Ray noted severe muscle spasm, stiffness and tenderness over the lumbosacral spine, specifically over L5/S1, pain and tenderness over her right hip, and limited straight leg raise (60 degrees on the right and 75 degrees on the left) (*Id.*). Dr. Ray treated Ms. Patel with a cortisone injection over the tender area in her right hip and L5/S1 (*Id.*). He prescribed a nonsteroidal anti-inflammatory drug ("NSAID") for inflammation and pain, Ultracet (a narcotic for moderate to severe pain), a lumbosacral corset, and physical therapy (*Id.*).

Ms. Patel returned to Dr. Ray on September 29, 2003 (R. 831). She complained of severe muscle spasm and pain in her back and right buttock from carrying her child (*Id.*). On examination, Dr. Ray noted that her lumbosacral spine had good ROM, but she had severe

---

[3]*See* http://www.mayoclinic.org/diseases-conditions/spinal-stenosis/basics/definition/con-20036105.

[4]Both of these MRIs indicate that Ms. Patel was referred for MRI by a Dr. Dudas (R. 527). The parties do not further identify this doctor.

[5]Ms. Patel reported that she had seen a neurosurgeon since the last time she saw Dr. Ray in 2000, but that the surgeon had told her there was no surgical remedy (R. 832). The record does not contain any notes from Ms. Patel's stated visit to that neurosurgeon. Although the parties do not mention it, we note that in our review of the record, we discovered a report from a different neurologist, Aleksandra Stobnicki, dated October 21, 1999, which noted that Ms. Patel had episodes of vertigo during her first pregnancy (R. 812).

muscle spasm and tenderness over her right sacroiliac joint (pelvic area) and limited straight leg raise (75 degrees on the right and 90 degrees on the left) (*Id.*). Dr. Ray diagnosed Ms. Patel with myofasciitis (chronic pain) with trigger points in the right sacroiliac area. He treated her with an cortisone injection and prescribed Norco for nighttime pain (*Id.*). Ms. Patel's neurological examination was "unremarkable" (*Id.*).

Ms. Patel had no other medical treatment before her DLI of March 31, 2005. On August 23, 2005, Ms. Patel's obstetrician prescribed physical therapy to address her complaints of pain in pregnancy (R. 828). She began physical therapy in September 2005, when she was 18 weeks pregnant with her second child, and attended ten to fifteen appointments through November 8, 2005 (R. 813, 819). Ms. Patel was initially assessed with pain in her lower back and pelvis radiating down her right leg, decreased ROM in her lower spine and pelvis, decreased strength in her bilateral hip flexors, and impaired gait (R. 815). By November 8, 2005, the physical therapy notes indicated that Ms. Patel was still extremely sensitive to touch in the lower spine with visible spasm in the surrounding muscles (R. 813). Ms. Patel gave birth to her second child in February 2006.

On June 1, 2006, Ms. Patel visited Dr. Ray, complaining of muscle spasm in her entire spine and pain in her right knee and left shoulder, which she reported stemmed from lifting her three-month old baby (R. 831). Dr. Ray reviewed Ms. Patel's "old x-ray," and opined that she had disc herniation from before (*Id.*). On examination, Ms. Patel had significant pain and tenderness, as well as muscle spasm in her left shoulder area and along her entire spine (*Id.*). Dr. Ray injected her with Cortisone in the left shoulder area, and prescribed ice and physical therapy (*Id.*). He also noted severe cartilage damage to her right knee, and wrote that he "want[ed] to re-

examine [it] again at a later time" (*Id.*). Ms. Patel's neurological exam was again "unremarkable" (*Id.*).

On October 11, 2006, Ms. Patel had an MRI of her lumbar spine while she was visiting India (R. 529). The MRI showed straightening of her lumbar spine, lateral and far lateral disc protrusion at the L4-5 level, and "significant[] narrowing" of the left sided neural foramen (spinal nerve) at that level (*Id.*). The remaining findings were normal (*Id.*).[6]

Nearly five years later, in September 2011, Ms. Patel filed for disability benefits. On November 8, 2011, a non-examining state agency consultant determined that there was not enough evidence prior to Ms. Patel's DLI to determine whether she was disabled (R. 412). This opinion was affirmed on reconsideration (R. 416-17).

On November 21, 2011, Dr. Ray completed a "Fibromyalgia Residual Functional Capacity Questionnaire" for Ms. Patel (R. 493). Using checkmarks, Dr. Ray indicated that Ms. Patel met the criteria for fibromyalgia and that her impairments lasted or will last at least 12 months. He also indicated by checkmarks that she had the following symptoms: multiple tender points, nonrestorative sleep, severe fatigue, morning stiffness, subjective swelling, dizziness, numbness and tingling, and impaired concentration, as well as pain in her lumbosacral spine, cervical spine, and bilateral shoulders, arms, hands/fingers, hips, legs, and knees/ankles/feet (*Id.*). Dr. Ray wrote that Ms. Patel "cannot work due to all conditions medical," and checked that she would be absent more than three times a month and would need to lie down at unpredictable intervals at work (R. 494). On November 21, 2012, Dr. Ray wrote a letter stating that his answers

---

[6] The record also contains medical reports documenting gastrointestinal and esophageal problems that Ms. Patel had from 2009 through 2012; medical notes from Dr. Ray dated 2011 through 2013; and MRIs of Ms. Patel's right shoulder and spine from late 2009 (*see* R. 813-955). As these documents were dated more than four years after the DLI, we do not detail their contents here, and Ms. Patel does not dispute the ALJ's decision not to rely on them in her opinion.

on the fibromyalgia questionnaire from the prior year applied to the period prior to March 31, 2005 (R. 811).

On November 25, 2012, Ms. Patel's attorney obtained an opinion from Julian Freeman, a doctor of internal medicine and neurology, based on his review of Ms. Patel's file. Dr. Freeman reviewed Ms. Patel's reports of severe back pain as well as the MRIs in the record. He stated that the presence of foraminal stenosis, due to disc protrusion and central stenosis at L4 and "fairly severely" at L5-S1, was seen in the 2000, 2001 and 2006 MRIs (R. 803-04).[7] Dr. Freeman stated that there was no medical data of pseudoclaudication (inflammation of the nerves emanating from the spinal cord) and no mention of walking limitations beyond Ms. Patel's description that she was limited to walking about half a block (R. 805). In addition, Dr. Freeman could not confirm a diagnosis of fibromyalgia because it was unclear from the data whether Ms. Patel's pain was due to fibromyalgia or an underlying inflammatory disorder (*Id.*).

Dr. Freeman concluded that Listing 1.04C was met since at least October 2001, based on the "severity of changes" shown in the April 2000 MRI, the "marked worsening" of "spinal stenosis with fairly severe nerve root impingement" seen in the May 2001 MRI,[8] and Ms. Patel's complaints of severe back pain (R. 805).[9] Dr. Freeman opined that from October 2001, Ms. Patel's spinal stenosis would have "resultant limitations on walking, standing, sitting, and postural changes," and she would "at best" be capable of: "walking and standing an hour a day in

---

[7] The Court notes that the reports accompanying the 2000 and 2001 MRIs do not correlate with Dr. Freeman's use of the phrase "fairly severely." The 2000 MRI reported "some foraminal encroachment bilaterally," and the 2001 MRI noted "mild to moderate central canal stenosis" with "slight increase" in disc protrusion at L5-S1 (R. 527-28). The October 2006 MRI noted that disc protrusion at the L4-5 level "significantly narrow[ed] the left sided neural foramen at that level" (R. 529).

[8] *See supra*, note 7.

[9] Dr. Freeman also opined that Listing 14.06.A (undifferentiated and mixed connective tissue disease involving two or more organs/body systems) was equaled from January 2010 to the current date due to an incompletely diagnosed systemic inflammatory disease (R. 803). We do not address Dr. Freeman's discussion of Ms. Patel's gastrointestinal system here because this time period is well after the DLI.

brief divided periods not exceeding a few minutes, of not more than half a block in distance at reduced pace[;] sitting 4-5 hours a day; lifting, carrying, pushing, pulling 10 lbs very rarely, no weight frequently, and 1-2 lbs occasionally[; and] rare (far less than occasional) postural changes of all types with almost no bending" (R. 805-06). He also noted that Ms. Patel's ability to travel to and from India occasionally was within the above functional capacity (*Id.*).

**III.**

Ms. Patel and her husband testified at the first hearing in this case, on November 28, 2012. Ms. Patel testified that she had mostly lower, but also upper back pain, which was "shooting, throbbing" as well as aching, and went down her legs, worse on the right side (R. 98, 116). In answer to the ALJ's question as to why she had so few medical records from the time period between her alleged onset date in 2001 and DLI in 2005, Ms. Patel responded that her medical records were hard to track down because her providers changed when her insurance changed, which it did often since her husband changed jobs a few times (R. 99).

Ms. Patel testified that between her alleged onset date and DLI, her back pain was so bad two to three days a week that she would lie down most of the day because she could not stand more than 20 minutes or sit for more than an hour to an hour and half (R. 102, 119). On a good day, she could do "normal" things like preparing meals (while taking breaks), but her husband and her brother helped with the kids and doing laundry (R. 105, 120). Ms. Patel did not make beds, vacuum, dust, mop, or sweep, and she could not bend or stoop, so sometimes her husband put her pants on for her, though she could load the dishwasher (R. 103-06, 117-18). She grocery shopped but her husband carried the bags, and she did minimal driving due to her right leg pain (R. 104-05).

Ms. Patel's husband, Ketan Patel, testified that before 2005, he had to help her with "everything" (R. 124). When he took her to shopping malls, a wheelchair was "always necessary" because Ms. Patel sometimes fell while walking (R. 124-25). Mr. Patel testified that his wife took several different drugs that relieved her pain but affected her mentally (R. 126). He also testified that he changed jobs every two to three years, so health insurance was "constantly changing," making it a challenge to get all of Ms. Patel's medical records (*Id.*). After Mr. Patel's testimony, the ALJ ended the hearing to allow Ms. Patel to obtain records for the "pertinent period at issue" (R. 129).

## IV.

On May 23, 2013, the ALJ held a second hearing. Ms. Patel's attorney stated that he tried to obtain all documents that were missing and essential to the case, specifically mentioning Ms. Patel's physical therapy records (Ex. 26F) and additional records from Dr. Ray (Ex. 27F) (R. 48-49).[10]

An ME, Arthur Lorber, a board-certified orthopedic surgeon, testified by telephone based on his review of the record. Dr. Lorber testified that during the period between the alleged onset date and DLI, there was evidence that Ms. Patel had degenerative disc disease, spasms, and pain in the lumbar spine, but there was no evidence of lumbar radiculopathy, lumbar central spinal canal stenosis, neurologic deficit, fibromyalgia, or claudication (pain caused by too little blood flow) (R. 54-57).[11] He concluded that Ms. Patel's impairments did not rise to Listing level during

---

[10]We note, however, that Ms. Patel did not produce any additional documents from Dr. Ray from the period between the alleged onset date and the DLI. The two pages of documents from this period -- describing Ms. Patel's March 12, 2003, and September 29, 2003 visits to Dr. Ray -- were already included in Exhibit 10F (*compare* Ex. 10F at R. 419-20 *with* Ex. 27F at R. 831-32). The additional documents from Dr. Ray that Ms. Patel produced included several notes dated from January 1996 through January 1997, and one note each from 1999, 2000, 2012, and 2013 (R. 833-36, 847). In addition, as we explained above, that the physical therapy notes that Ms. Patel produced were dated after the DLI, from September through November 2005.

[11]*See* http://www.mayoclinic.org/diseases-conditions/claudication/basics/definition/con-20033581.

this time period, and that she had the residual functional capacity ("RFC") to do a range of light work (occasionally lift 20 pounds and frequently 10 pounds), but was limited to standing and/or walking two hours per day, 30 minutes at a time, and sitting six hours per day, one hour at a time, in between which she could stand or move about her workstation for a minute or two (R. 56, 58). In addition, Ms. Patel could occasionally crouch and stoop, operate foot pedals, and ascend/descend chairs or ramps, but she could not kneel, crawl, or climb ladders, scaffolds, or ropes (R. 58).

Dr. Lorber stated that no radiologist diagnosed Ms. Patel with spinal stenosis (R. 56). After the ALJ's examination, Ms. Patel's attorney directed Dr. Lorber to look at the language in the May 2001 MRI reporting mild to moderate central canal stenosis (R. 59). Dr. Lorber acknowledged the findings in the MRI, but he opined that Listing 1.04C was not met based on the clinical findings (R. 59-60, 66-67). Dr. Lorber explained that the diagnosis of stenosis on imaging studies must correlate with clinical findings, but the clinical findings here did not correlate with the imaging studies (R. 66-67). In support of this opinion, Dr. Lorber relied on the reports of Dr. Ray from that time period, which diagnosed lumbar radiculopathy but not central spinal canal stenosis, as well as Ms. Patel's description of her symptomology, which did not show neurogenic claudication as required by 1.04C (*Id.*). Moreover, Dr. Lorber noted that Ms. Patel's complaints of back pain in 2000 (prior to the alleged onset date) while she was pregnant with her first child were "not particularly unusual," and that Ms. Patel sought physical therapy from September to November 2005 (after the DLI) because she was having problems associated with her second pregnancy (R. 53, 55-56).

The ALJ asked the VE what jobs would be available for an individual with the RFC given by Dr. Lorber (R. 77-78). The VE responded that Ms. Patel's past relevant work as a

doctor's office clerk would be available as often performed, but not at the fast pace that Ms. Patel previously performed it (R. 79-80). In addition, the individual could perform work as an address clerk, account clerk, and telephone clerk (R. 80-81). If pain limited the individual to three-to-four step, simple, repeated and routine tasks, Ms. Patel's past work would be precluded because it was semi-skilled, but account and telephone clerk positions would be available at the unskilled level (R. 81). If the individual had to miss more than one day of work per month or was off-task more than 15 percent of the workday, no positions would be available (R. 82).

Ms. Patel then testified again, stating that during the relevant time period, her symptoms in her lower back and right side were sometimes so severe that she could not move forward or backward, but she did not have many symptoms on her left side (R. 85-86). Following that testimony, in response to questioning by Ms. Patel's attorney, the VE testified that under Dr. Freeman's RFC -- which Ms. Patel's attorney described as allowing walking and standing one hour a day and sitting four to five hours a day -- an individual could not, by definition, be able to perform full-time work at eight-hours per day (R. 88-89).

## V.

On August 27, 2013, the ALJ issued a written decision finding that Ms. Patel was not disabled between her alleged onset date of October 1, 2001, and her DLI of March 31, 2005 (R. 30). At Step 1, the ALJ found that Ms. Patel had not engaged in substantial gainful activity during this time period (R. 32). At Step 2, the ALJ determined that Ms. Patel had severe impairments of degenerative disc disease with mild to moderate stenosis of the lumbar spine, and a history of arthroscopic surgery on the right knee in 1996 (R. 32). The ALJ noted that after surgery in early 1996, Dr. Ray noted that Ms. Patel "did well," though she continued to complain of intermittent periods of severe low back pain radiating into her buttocks and right leg, at times

exacerbated by lifting her children (R. 32-33). The ALJ reviewed the April 2000, May 2001, and October 2006 MRIs of Ms. Patel's lumbar spine, as well as Dr. Ray's notes during that period, which showed Ms. Patel's straight leg raise was positive for pain, though her reflexes, motor strength and sensation were unremarkable (R. 33). The ALJ noted that Dr. Ray gave Ms. Patel injections and prescribed medications, physical therapy, and the use of a lumbosacral corset for her pain (*Id.*).

The ALJ concluded that Ms. Patel did not suffer from an autoimmune disorder or fibromyalgia (R. 33). The ALJ explained that neither Dr. Freeman nor Dr. Lorber found evidence in the medical record to support a diagnosis of those impairments on or before the DLI (*Id.*). The ALJ noted that Dr. Freeman admitted that there were discrepancies between his report and the medical record (no evidence of positive trigger point testing), and that the diagnosis of fibromyalgia was very difficult to confirm with the available data (*Id.*). The ALJ found that Ms. Patel's other impairments -- endometriosis, vascular headaches, positional vertigo, gastroesophageal reflux disease ("GERD"), and irritable bowel syndrome ("IBS") -- were non-severe between the alleged onset date and the DLI (R. 33-34).

At Step 3, the ALJ found that none of Ms. Patel's impairments, alone or in combination, met or medically equaled the severity of a Listing, specifically considering Listings 1.02 (major dysfunction of a joint) and 1.04 (disorders of the spine) (R. 34). The ALJ found that Dr. Ray's reports showed that Ms. Patel could ambulate effectively and independently, take her children to and from school, prepare food (with breaks), use the dishwasher, shop, drive, go to church, and travel to and from India (R. 34-35). In addition, the ALJ found that although mild to moderate stenosis was noted in the May 2001 MRI, Dr. Ray noted no claudication symptoms before the

DLI, and his examinations showed that Ms. Patel had normal motor strength and reflexes and no neurological deficits (R. 34).

The ALJ determined that through the DLI, Ms. Patel had the RFC to:

> perform less than a full range of light work . . . as she can lift and carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk a total of two hours during an eight hour day but must be allowed to sit one to two minutes after standing 30 minutes, and can sit for a total of six hours during an eight hour day but must be allowed to stand one to two minutes after sitting one hour. She can no more than occasionally operate foot controls and push and/or pull with both lower extremities. She can never climb ladders, ropes, and scaffolds and can never kneel and crawl. She can no more than occasionally crouch and stoop. She must avoid concentrated exposure to vibration and work hazards such as dangerous moving machinery and she must avoid work at unprotected heights.

(R. 34-35).

The ALJ found that Ms. Patel's statements concerning the intensity, persistence and limiting effects of her alleged symptoms were "not entirely credible" and "not persuasive" because her allegations were "inconsistent with and not well supported by the objective medical findings in the record and therefore not entitled to significant weight" (R. 36-37). The ALJ noted Ms. Patel's testimony that she did no chores that required bending and that her husband did the housework and yard work and helped her hand wash the dishes (R. 35-36). However, the ALJ found her testimony unpersuasive because Ms. Patel received only "conservative treatment" for her back pain between May 1996 and January 1997, and then did not return for treatment of her back pain until "almost three years later," in December 1999, at which point she had an MRI and received conservative treatment until January 2000 (R. 36). In May 2001, Ms. Patel had another MRI, but she sought additional conservative treatment only twice before her DLI -- on March 12, 2003, and September 29, 2003 -- for back pain that arose after she lifted her child (R. 36-37). She also "obtained a prescription for physical therapy to address back pain in August 2005 (four

months after the date last insured)" (R. 36), back pain that corresponded with a pregnancy (R. 828).

In addition, the ALJ found no evidence in the record documenting a need for an assistive device prior to Ms. Patel's DLI (R. 36). The ALJ observed that Ms. Patel walked independently at both hearings and did not report using an assistive device in the function report she filled out on September 27, 2011 (*Id.*). Thus, the ALJ gave "no weight" to her husband's testimony that Ms. Patel used a wheelchair every time they shopped at the mall (*Id.*).

The ALJ next addressed the medical opinions in the record. She gave "no weight" to the state agency medical consultants' opinions finding insufficient evidence in the record to make a determination prior to the DLI because Ms. Patel subsequently submitted additional records (R. 36). The ALJ also gave "no weight" to Ms. Patel's gastroenterologist's opinion that she had chronic GERD and IBS, because "[t]here was a treatment gap between 1997 (around four years before the alleged onset date) and 2008 (approximately three years after the date last insured)" (*Id.*, citing Ex. 12F (R. 489-90)). In addition, the ALJ gave "no weight" to Dr. Ray's fibromyalgia RFC questionnaire because Dr. Ray's treatment notes "do not correlate with findings of fibromyalgia" (R. 37). Moreover, the ALJ stated that "it is questionable if this doctor is actually a treating source, since he saw the claimant only sporadically and only two times during the period at issue" (*Id.*).

The ALJ gave "some but not significant weight" to Dr. Freeman, who "was retained by the claimant's attorney to review the medical record" (R. 37). The ALJ stated that "[a]lthough such evidence is certainly legitimate and deserves due consideration, the context in which it was produced cannot be entirely ignored" (*Id.*). The ALJ disagreed with Dr. Freeman's opinion that Ms. Patel's impairment met the criteria for Listing 1.04, because the doctor "admitted" that he

"ma[de] findings without any objective medical records to support them," and the medical record lacked findings of neurological deficits or claudication (*Id.*). In addition, the ALJ disagreed with Dr. Freeman's finding that Ms. Patel can walk only about half a block because she reported that she could walk one-half to one block, and "[t]here is nothing in the record nor in the claimant's presentation at the hearing to suggest she is unable to ambulate effectively" and without assistance (*Id.*). Moreover, the ALJ reiterated that Ms. Patel can drive and go out alone, and that "[b]oth of her visits for back pain in 2003 were generated after lifting her child" (*Id.*).

The ALJ gave Dr. Lorber "some but not controlling weight" because he is not a treating source, and he "seemed unaware" of the May 2001 MRI that showed mild to moderate stenosis (R. 37). Nevertheless, the ALJ took that MRI into account and found that Ms. Patel had stenosis since 2001 but that she did not fulfill the Listing requirements for stenosis or any other back disorder (*Id.*). The ALJ gave "some weight" to Dr. Lorber's assessment of Ms. Patel's RFC through the DLI because it was consistent with the medical record, and the record lacked findings to support Ms. Patel's allegations that she could not work since her alleged onset date (*Id.*).

At Step 4, the ALJ found that Ms. Patel was capable of performing her past relevant work as a doctor's office clerk as it is generally performed in the national economy (R. 37-38). Alternatively, the ALJ found at Step 5 that there were other jobs existing in the national economy that Ms. Patel was able to perform with her RFC (R. 38-39).

## VI.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence," *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (internal

citations and quotations omitted). That said, deferential review does not mean no review. "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review." *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014).

Ms. Patel argues that the ALJ made several errors requiring remand, including: (1) inadequately supporting her adverse credibility assessment; (2) inadequately analyzing the medical opinions in the record; (3) failing to support her RFC assessment with substantial evidence; (4) failing to address evidence demonstrating decreased range of motion in plaintiff's spine which would undermine plaintiff's ability to occasionally stoop and crouch; and (5) inadequately evaluating the testimony of plaintiff's husband (doc. # 17: Pl.'s Br. at 1). For the reasons stated below, we disagree with Ms. Patel and affirm the Commissioner's decision.

## A.

Ms. Patel contends that the ALJ did not adequately support her determination that Ms. Patel's allegations were "not entirely credible" because the ALJ failed to specify which statements were credible and which were not; evaluate the credibility factors in 20 C.F.R. § 404.1529; and question Ms. Patel about the reasons why her treatment was conservative and intermittent before drawing an adverse inference (Pl.'s Br. at 6-9; doc. # 28: Pl.'s Reply at 1-4). We disagree.

It is well-settled that so long as an ALJ gives specific reasons supported by the record, "[w]e review the ALJ's credibility assessment with special deference and will only overturn it if it is patently wrong." *Vanover v. Colvin*, 627 F. App'x 562, 566 (7th Cir. 2015). "Credibility

determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (internal citations and quotations omitted).

Here, the ALJ adequately evaluated the credibility factors and specified her credibility findings before drawing an adverse inference. Contrary to Ms. Patel's contentions, the ALJ did not ignore Dr. Ray's treatment notes in 1999 and 2006 indicating that Ms. Patel complained of right knee pain (Pl.'s Br. at 8). Indeed, the ALJ repeatedly referred to Dr. Ray's treatment notes, including from 1996, 1999 and 2006. But, the ALJ did not find that these records -- from before the alleged onset date and after the DLI -- supported Ms. Patel's claims that she was disabled during the relevant time period.

In addition, the ALJ adequately considered Ms. Patel's testimony that due to severe pain down her back and legs, she could not bend, squat or kneel and needed help with many household chores (R. 35-36). The ALJ found that the following evidence undermined Ms. Patel's allegations of severe functional limitations: (1) her testimony that she could prepare meals, shop, drive, use the dishwasher and care for her children; (2) the fact that she made only two visits seeking medical treatment for her pain between the alleged onset date and the DLI, and only sporadic visits before and after that time period; (3) Dr. Ray's description of the treatment Ms. Patel received (including local injections, bed rest, and medication) as "conservative;" (4) the ALJ's observation that Ms. Patel walked independently at both hearings; and (5) the absence of credible evidence that Ms. Patel had trouble walking independently (R. 35-36). *See Olsen v. Colvin*, 551 F. App'x 868, 875 (7th Cir. 2014) (holding that ALJ's finding that claimant's treatment was conservative was supported by substantial evidence, where claimant saw physician

16

only one to two times per year, and the most invasive treatment she received for back pain was epidural steroid injections).

Nevertheless, Ms. Patel contends that the ALJ's reasoning was inadequate because the ALJ did not ask why her treatment was conservative and intermittent before drawing an adverse inference from it (Pl.'s Br. at 6-7; Pl.'s Reply at 2). Although a history of sporadic treatment or the failure to follow a treatment plan can undermine a claimant's credibility, an ALJ must explore the claimant's reasons for the lack of medical care before drawing a negative inference. *Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012). Therefore, an ALJ may need to develop the record to determine whether there are good reasons the individual did not seek medical treatment or comply with prescribed treatment, such as inability to afford treatment, ineffectiveness of further treatment, or intolerable side effects. *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014), *as amended* (Aug. 20, 2014). Here, the ALJ did so.

At the first hearing, in response to the ALJ's questions regarding the lack of medical evidence between the alleged onset date and the DLI, Ms. Patel, her husband, and her attorney testified that they had trouble obtaining Ms. Patel's medical records because her insurance coverage changed every couple of years as her husband changed jobs. There was no suggestion at either hearing that Ms. Patel ever lacked insurance or could not afford medical care, although Ms. Patel's attorney questioned Ms. Patel and the other witnesses extensively at both hearings. Ms. Patel now also contends that further treatment would have been ineffective because a neurosurgeon had told her there was no surgical option to treat her pain (Pl.'s Br. at 7).[12] However, the ALJ's conclusion that Ms. Patel's treatment was conservative did not rest on her

---

[12]Ms. Patel contends that the ALJ should have found that the evidence "demonstrates" that Ms. Patel was seeing at least one other physician during the relevant time period due to Dr. Ray's note that Ms. Patel had told him that she had visited a neurosurgeon (Pl.'s Reply at 8). We do not fault the ALJ for declining to speculate as to Ms. Patel's visit to a neurosurgeon in the absence of any other evidence as to that meeting.

decision not to pursue surgery, but on her decision to visit the doctor for her back condition only twice between the alleged onset date and DLI.

The lack of evidence available with respect to Ms. Patel's condition "during the critical period prior to her date last insured" was an appropriate reason for the ALJ to find her testimony not credible. *See Eichstadt v. Astrue*, 534 F.3d 663, 668 (7th Cir. 2008). "[I]ndeed, it is hard to imagine what else the ALJ could have done." *Id.* "The claimant bears the burden of producing medical evidence that supports her claims of disability. That means that the claimant bears the risk of uncertainty, even if the reason for the sparse record is simply a long lapse of time." *Id.* *See also Guranovich v. Astrue*, No. 09 C 3167, 2011 WL 686358, at \*18 (N.D. Ill. Feb. 15, 2011), aff'd, 465 F. App'x 541 (7th Cir. 2012) (quoting *Eichstadt*, 534 F.3d at 668). This is not an unfair burden, especially where, as here, the claimant was represented by counsel. *See Halsell. v. Astrue*, 357 F. App'x 717, 723 (7th Cir. 2009) (ALJs are permitted to assume that a claimant represented by counsel has presented the "strongest case for benefits").

Ms. Patel contends that the ALJ should have specifically discussed her testimony that she suffered two to three bad days a week, which "allow[ed] her less frequent visits to her physician" (Pl.'s Br. at 7). Alternatively, Ms. Patel argues that she structured her activities to reduce her symptoms (performed fewer chores, took more breaks, and relied more on others), allowing her less frequent visits to her physician (Pl.'s Reply at 3). However, these explanations for "less frequent" visits to the doctor do not undermine the ALJ's determination that Ms. Patel's decision to seek medical treatment for her alleged impairments only twice during the relevant time period casts doubt upon her allegations as to the severity of her impairments and functional limitations. *See Puchalski v. Colvin*, No. 15-2103, 2016 WL 3081956, at \*2 (7th Cir. June 1, 2016) (affirming ALJ's decision to discredit the claimant's complaints of disabling pain due to her

infrequent and conservative medical treatment); *Lott v. Colvin*, 541 F. App'x 702, 706 (7th Cir. 2013), *as amended* (Oct. 17, 2013) (affirming ALJ's determination that relied on a lack of treatment as one reason to question the severity of the claimant's depression and anxiety, because although the ALJ should have asked the claimant why she did not seek treatment, the ALJ reasonably relied on the claimant's daily activities to conclude that her mental health issues were not disabling).

Likewise, the ALJ's failure to specifically mention Ms. Patel's testimony that she had to lie down two to three days per week does not require remand. "[A]n ALJ need not mention every piece of evidence as long as the ALJ has not cherry-picked facts to support her conclusion." *Green v. Colvin*, 605 F. App'x 553, 558-59 (7th Cir.), *cert. denied*, 136 S. Ct. 187 (2015) (internal quotations omitted) (holding that remand was not required where ALJ did not mention that claimant had reported headaches and shoulder pain because ALJ's decision was supported by substantial evidence). Here, "[t]he ALJ properly considered the record as a whole and did not neglect to address any evidence undermining h[er] credibility finding." *Slayton v. Colvin*, 629 F. App'x 764, 770-71 (7th Cir. 2015) (holding that ALJ's failure to specifically analyze how the claimant's hepatitis C diagnosis affected her ability to work did not require remand because nothing in the record suggested that the claimant manifested any symptoms of hepatitis C which would limit her functioning). The ALJ adequately considered Ms. Patel's allegations that severe pain and functional limitations rendered her unable to work, and supported her decision not to credit these allegations with substantial evidence.

**B.**

Ms. Patel next contends that the ALJ inadequately analyzed the opinions of Drs. Freeman, Lorber and Ray (Pl.'s Br. at 9-15). We disagree. We review the ALJ's determination as to each doctor's opinion below.

**1.**

On November 25, 2012, Dr. Freeman, a doctor of internal medicine and neurology, submitted an opinion as to the severity of Ms. Patel's impairments based on a review of the record. Ms. Patel contends that the ALJ did not adequately evaluate Dr. Freeman's opinion because: (1) the ALJ improperly considered that Ms. Patel's attorney had requested Dr. Freeman's review of Ms. Patel's file; (2) the ALJ failed to address Dr. Freeman's opinion that her impairments equaled Listing 1.04(c) based on the May 29, 2001 MRI alone; and (3) the ALJ failed to specifically address Dr. Freeman's opinion as to Ms. Patel's functional limitations (Pl.'s Br. at 10-11; Pl.'s Reply at 4).

Ms. Patel argues that the fact that her attorney requested Dr. Freeman's review of the file "was not a legitimate basis to evaluate the reliability of his report" (Pl.'s Br. at 10). The cases cited by Ms. Patel do not prohibit any consideration of the circumstances surrounding the issuance of a doctor's report; rather, those cases hold that the fact that evidence has been solicited by the claimant or her representative is "not a sufficient justification to belittle or ignore that evidence." *Punzio v. Astrue*, 630 F.3d 704, 712 (7th Cir. 2011). Here, the ALJ noted that "the context in which [Dr. Freeman's report] was produced cannot be entirely ignored," and then, after giving the report "due consideration," relied on several additional factors to support assigning Dr. Freeman's opinion "some but not significant weight" (R. 37). *Compare Chase v. Astrue*, 458 F. App'x 553, 557 (7th Cir. 2012) (holding that remand was necessary because the

ALJ provided no other basis for rejecting the physician's opinion beyond the fact that the medical report was provided at the request of the claimant's counsel).

To begin with, the ALJ relied -- "[m]ore importantly" -- on the fact that Dr. Freeman was not a treating source, and was retained only to review the medical record and give a report (R. 37). In addition, the ALJ found that Dr. Freeman "ma[de] findings without any objective medical records to support them" (R. 37). The ALJ explained that Dr. Freeman opined that Ms. Patel "equals the severity criteria of section 1.04, yet the medical record lacks findings of neurological deficits to show the radicular findings or claudication, and the claimant is able to ambulate independently without assistance" (*Id.*). In support of these findings, the ALJ cited to the page of Dr. Freeman's report stating that "[t]he medical reports provide no clear description of walking ability," and "[t]he actual medical data are devoid of data regarding either the presence or absence of the critical elements for this diagnosis [pseudoclaudication]" (R. 804).

Ms. Patel's contention that the ALJ failed to address Dr. Freeman's opinion that her impairments equaled Listing 1.04(c) (Pl.'s Br. at 11) is belied by the text of the ALJ's opinion that we cite above. The ALJ considered Dr. Freeman's opinion as well as the MRI evidence, but unlike Dr. Freeman -- who described the MRIs as showing "fairly severe nerve root impingement" (R. 805) -- the ALJ relied on the 2001 MRI and Dr. Ray's reports from before the DLI to find that Ms. Patel had only mild to moderate stenosis of the lumbar spine, which the ALJ's review of the evidence showed did not satisfy the criteria of Section 1.04 (R. 32, 34).

The above discussion shows that the ALJ supported her determination to give some but not significant weight to Dr. Freeman's opinion with substantial evidence. Contrary to Ms. Patel's contentions, the ALJ did not need to address Dr. Freeman's opinion on how long Ms. Patel could sit or stand in a day before making this determination (*see* Pl.'s Br. at 10-11). Dr.

Freeman offered an RFC assessment based on the conclusions he drew after his review of the record. The ALJ disagreed with the conclusions Dr. Freeman drew, determining that they relied too heavily on Ms. Patel's subjective complaints and too little on the medical evidence in the record (R. 37). The fact that the ALJ disagreed with Dr. Freeman does not mean that he failed to consider Dr. Freeman's findings. The ALJ did not err by not discussing the specific functional limitations offered by Dr. Freeman based on his conclusions. *See Green*, 605 F. App'x at 558-59 ("ALJ need not mention every piece of evidence as long as the ALJ has not cherry-picked facts to support her conclusion").

**2.**

Ms. Patel next argues that "[r]eliance upon Dr. Lorber's opinions, at all, was unreasonable given that he had missed arguably the most important piece of evidence in the file for the period under review -- the May 2001 MRI demonstrating spinal stenosis" (Pl.'s Br. at 12). We disagree.

The ALJ gave Dr. Lorber's opinion "some but not controlling weight" because the ALJ found that his estimate of Ms. Patel's RFC through the DLI was consistent with the medical record (R. 37). While the ALJ noted that Dr. Lorber "seemed unaware" of the May 2001 MRI, in fact Dr. Lorber addressed the 2001 MRI in response to questioning by Ms. Patel's attorney. Dr. Lorber explained that he stood by his opinion even in light of the findings in the 2001 MRI because the clinical findings did not correlate with the imaging studies (R. 59-60, 66-67).

At bottom, the ALJ did take the 2001 MRI into account, as well as the other evidence in the record, and found that Dr. Lorber's RFC opinion was consistent with the medical record as a whole (R. 37). Indeed, the ALJ avoided error by declining to do what Ms. Patel urges: ignore Dr.

Lorber's entire opinion in favor of "cherry-picking" one piece of evidence -- the 2001 MRI -- in the 955-page record.

**3.**

Ms. Patel also argues that the ALJ erred in assigning no weight to Dr. Ray's opinion from November 2011 that Ms. Patel suffered from fibromyalgia and IBS before her DLI and could not sustain full-time work because she would be absent more than 3 days per month (Pl.'s Br. at 12-14). Ms. Patel contends that the ALJ failed to apply the factors in 20 C.F.R. § 404.1527 to analyze Dr. Ray as a treating source, and that the ALJ should not have discounted Dr. Ray's opinion based on the gaps in Ms. Patel's medical treatment (*Id.* at 13).

The ALJ questioned whether Dr. Ray was a treating physician between Ms. Patel's alleged onset date and her DLI, because Dr. Ray only saw Ms. Patel twice during this period. However, despite her reservations, the ALJ accepted Dr. Ray as a treating physician and evaluated his opinion with the factors set forth in Section 404.1527(c)(2). After evaluating those factors, the ALJ gave "good reasons" for rejecting Dr. Ray's opinion. *See Lehouillier v. Colvin*, 633 F. App'x 328, 334 (7th Cir. 2015) ("ALJs are required to give 'good reasons' for any decision not to award controlling weight to a treating source").

As required by Section 404.1527(c)(2)(i), the ALJ considered the length, nature and extent of Dr. Ray's treatment relationship with Ms. Patel. The ALJ gave less weight to Dr. Ray's opinion because he saw Ms. Patel "only sporadically and only two times during the period at issue" between the alleged onset date and the DLI (R. 37). *See Spies v. Colvin*, 641 F. App'x 628, 636 (7th Cir. 2016) (holding that the ALJ properly considered the fact that the claimant saw the treating physician only once a year in rejecting that physician's opinion).

In addition, the ALJ considered the supportability and consistency of Dr. Ray's opinion as required by Sections 404.1527(c)(3) and (c)(4). As explained above, the ALJ found that Dr. Ray's earlier treatment notes do not correlate with -- *i.e.*, were not consistent with and did not support -- Dr. Ray's November 2011 opinion that Ms. Patel had fibromyalgia and IBS and could not work (R. 37). This "provide[s] good cause to deny controlling weight to a treating physician's opinion." *Lehouillier*, 633 F. App'x at 334. *See also Kladis v. Colvin*, No. 12 C 7694, 2014 WL 2210462, at *5 (N.D. Ill. May 27, 2014) (holding that "it was difficult to see how" a treating physician's opinion in 2010 that the claimant's impairment had rendered her disabled between 2003 and 2005 "would have been grounded in the requisite legitimate medical basis given his failure to diagnose . . . [the] impairment in his preceding [] years of treating [the claimant]") (internal quotations and citations omitted). The ALJ's decision to reject Dr. Ray's 2011 opinion was supported by substantial evidence. *See Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) ("If the ALJ discounts the physician's opinion after considering these [§ 1527] factors, we must allow that decision to stand so long as the ALJ minimally articulated his reasons—a very deferential standard . . .") (internal quotations and citations omitted).

Ms. Patel argues that even if the ALJ found that limitations due to fibromyalgia were unsupported by the evidence, the ALJ should have given weight to Dr. Ray's opinion that she was limited due to back and knee pain, as Dr. Ray had been her treating orthopedic surgeon (Pl.'s Reply at 9). We find that:

> [t]hese arguments repackage in slightly different language a contention that the ALJ should have ruled in [Ms. Patel's] favor because the evidence favors h[er]. But an ALJ's job is to weigh conflicting evidence, and the loser in such a process is bound to believe that the finder of fact should have been more favorable to h[er] cause. The substantial-evidence standard, however, asks whether the administrative decision is rationally supported, not whether it is correct . . .

*Sanders v. Colvin*, 600 F. App'x 469, 470 (7th Cir. 2015). Here, the ALJ did consider and give weight to Dr. Ray's treatment notes in finding that Ms. Patel had degenerative disc disease and in assigning her a restrictive RFC, but the ALJ determined that all of the evidence together did not support a finding of disability. We find that the ALJ's decision was supported by substantial evidence.

C.

Ms. Patel next argues that the ALJ erred by crafting an RFC without explaining how that RFC was supported by evidence in the record (Pl.'s Br. at 15). As explained above, the ALJ found that from the alleged onset date to the DLI, Ms. Patel had the RFC to occasionally lift and carry 20 pounds and frequently 10 pounds; stand and/or walk two hours per day, but must be allowed to sit for one to two minutes after standing for 30 minutes; sit six hours per day, but must be allowed to stand one to two minutes after sitting one hour; occasionally operate foot controls, push/pull with both lower extremities, and crouch and stoop; never climb ladders, ropes and scaffolds, and never kneel or crawl; and avoid concentrated exposure to vibration and work hazards (R. 35). Ms. Patel compares this RFC to those offered by Dr. Lorber and Dr. Freeman, and concludes that the ALJ "appears to have adopted Dr. Lorber's opinion" except that the ALJ did not include the limitation to occasionally ascend or descend chairs or ramps (Pl.'s Br. at 16; *see also* R. 58). Ms. Patel contends that the ALJ erred by not including more restrictions in the RFC because Dr. Lorber did not review the May 2001 MRI (Pl.'s Reply at 10). She suggests that Dr. Freeman's RFC opinion (walking/standing one hour per day, not more than a few minutes at a time, and sitting four to five hours per day) was more appropriate because Dr. Freeman had considered the May 2001 MRI (Pl.'s Br. at 15-16).

As Ms. Patel correctly notes, an ALJ "may not 'play doctor' by using his own lay opinions to fill evidentiary gaps in the record." *Chase*, 458 F. App'x at 557. Instead, the ALJ's RFC determination must be supported by evidence in the record. *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010). While it is the claimant's "burden to present medical evidence supporting her claim of disability," *Olsen*, 551 F. App'x at 875, if there are gaps in the record, "it [i]s the ALJ's responsibility to recognize the need for further medical evaluations . . . before making her residual functional capacity and disability determinations." *Suide*, 371 F. App'x at 690. In this case, the ALJ endeavored to help Ms. Patel fill in the gaps in the record: giving her additional time to supplement the record, holding a second hearing after new evidence was received, and inviting an orthopedic medical expert to testify at the second hearing.

"The cases in which [the Seventh Circuit] ha[s] concluded that an ALJ 'played doctor' are ones in which the ALJ ignored relevant evidence and substituted her own judgment." *Olsen*, 551 F. App'x at 874. The ALJ did not do this here. Contrary to Ms. Patel's contentions, the ALJ relied on the entire record, as well as her personal observations of Ms. Patel, to arrive at an RFC which was supported by substantial evidence, not the ALJ's own lay opinions. RFC determinations -- the extent of what a claimant can do despite her limitations -- are "committed to the exclusive discretion of the ALJ." *Bates v. Colvin*, 736 F.3d 1093, 1100 n.4 (7th Cir. 2013) (citing 20 C.F.R § 404.1527(d)). The ALJ has the responsibility to resolve any conflicts between the medical evidence and the claimant's testimony. *Pepper v. Colvin*, 712 F.3d 351, 363 (7th Cir. 2013). The ALJ properly did so here. Ms. Patel simply did not meet her "burden to present medical evidence supporting her claim of disability." *Olsen*, 551 F. App'x at 875.

Ms. Patel's arguments to the contrary are unavailing. She insists that the ALJ either impermissibly rendered her own lay opinion regarding the meaning of the 2001 MRI evidence or

failed to point to evidence that explained her RFC because the ALJ did not add limitations to Dr. Lorber's RFC opinion, which did not consider the 2001 MRI (Pl.'s Br. at 16; Pl.'s Reply at 11). However, the ALJ supported her determination that Dr. Lorber's RFC was consistent with the medical record with substantial evidence. The ALJ reviewed the 2001 MRI showing mild to moderate central canal stenosis and determined accordingly that Ms. Patel had the severe impairment of mild to moderate stenosis of the lumbar spine (R. 33). However, after considering the entire record, the ALJ determined that the 2001 MRI did not warrant further limitations in the RFC (R. 34-35, 37).[13] Ms. Patel does not identify medical evidence -- beyond the May 2001 MRI and Dr. Freeman's report, which the ALJ adequately addressed -- that would justify further restrictions. *See Loveless v. Colvin*, 810 F.3d 502, 508 (7th Cir. 2016).

## D.

Ms. Patel next argues that the ALJ erred in failing to address notes from her physical therapist indicating that she had decreased range of motion in her spine, which Ms. Patel contends was inconsistent with the ALJ's opinion that she could occasionally stoop and crouch (Pl.'s Br. at 16-17). In her written opinion, the ALJ noted that Ms. Patel obtained a prescription for physical therapy four months after her DLI, but the ALJ did not discuss this evidence further (R. 36). Ms. Patel contends that the ALJ erred in not relying on the physical therapy notes from September through November 2005 because "there was no evidence of a significant deterioration in functioning" from the date of Ms. Patel's DLI to the time of her physical therapy (Pl.'s Reply at 11), and "it is reasonable to assume such limits [in the physical therapy notes] were present as of a few months prior, in March 2005" (Pl.'s Br. at 17).

---

[13]The ALJ's decision to omit Dr. Lorber's limitation to occasionally ascend or descend chairs or ramps from the RFC does not affect the result here, because there is no suggestion that Ms. Patel's past relevant work and the other jobs that the ALJ found that Ms. Patel could perform would require ascending or descending ramps or chairs.

Ms. Patel's argument here is disingenuous. As explained above, Ms. Patel was prescribed physical therapy in August 23, 2005, to address her complaints of lower back pain in pregnancy (R. 828). Ms. Patel was 18 weeks pregnant when she began physical therapy in September 2005 (R. 813), meaning that she was not pregnant as of her DLI of March 31, 2005. It is thus far from "reasonable to assume" that the physical therapist's notes of decreased range of motion in Ms. Patel's back in September 2005 would have been present in March 2005. Ms. Patel had the burden to present evidence that the limitations observed by her physical therapist were present before her DLI; mere assumption and speculation is not enough. *See Olsen*, 551 F. App'x at 875. Thus, the ALJ's decision not to use the post-DLI physical therapy notes to further restrict Ms. Patel's RFC to no stooping or crouching was not error.

### E.

Finally, Ms. Patel argues that the ALJ's evaluation of her husband's testimony was "legally insufficient" (Pl.'s Br. at 18). The ALJ considered Mr. Patel's and his wife's testimony that he had to help her with dressing, grooming, housework and yard work (R. 35-36). However, the ALJ gave "no weight" to Mr. Patel's statement that his wife used a wheelchair when they went shopping at the mall (R. 36). The ALJ explained that "[t]here was no evidence in the record documenting the need for an assistive device" prior to or on Ms. Patel's DLI, Ms. Patel did not report using an assistive device, and the ALJ observed her walking independently at both hearings (*Id.*). Moreover, the ALJ noted that Mr. Patel had a "personal financial interest" in seeing his wife receive benefits (*Id.*).

Ms. Patel argues that the ALJ's observations and the lack of evidence in the record showing that she needed an assistive device "do[] not undermine" Mr. Patel's testimony of her need for a wheelchair or her testimony that she could only stand or walk for short periods of time

(Pl.'s Br. at 18-19). To the contrary, that is exactly what the ALJ's explanations do. By relying on Ms. Patel's function reports and medical reports as well as her own observations, the ALJ supported her decision to assign no weight to Mr. Patel's testimony with substantial evidence. *See Guranovich v. Astrue*, 465 F. App'x 541, 544 (7th Cir. 2012) (holding that ALJ properly accorded claimant's wife's testimony less weight because it was not supported by contemporaneous medical evidence).

Moreover, as the ALJ's explanations show, the ALJ did not reject Mr. Patel's testimony "merely" because of his relationship with his wife (Pl.'s Br. at 19). While the testimony of a relative may not automatically be discounted for bias, *see Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013), the ALJ does not err in considering the potential for bias as one factor in assessing what weight to give the testimony. *See Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015) (an ALJ may discount applicants' testimony on the basis of other evidence, including an incentive to exaggerate their symptoms).

## CONCLUSION

For the aforementioned reasons, we deny Ms. Patel's request for reversal or remand (doc. # 17) and affirm the Commissioner's denial of disability benefits. The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: August 10, 2016